UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. EA-22-2977 |
| ISAAC M. NEUBERGER, | * | |
| Defendant. | * | |

MEMORANDUM OF DECISION

Plaintiff United States of America initiated this action on November 16, 2022, pursuant

to the Federal Priority Statute, 31 U.S.C. § 3713, seeking a judgment finding that Defendant

Isaac M. Neuberger is personally liable for the outstanding tax liability of Lehcim Holdings, Inc.

(Lehcim).  The Court held a bench trial on the United States' sole claim on August 4-6, 2025.[1]

Following trial, the parties filed proposed findings of fact (ECF Nos. 135, 139–140) and

proposed conclusions of law (ECF Nos. 141–142), and the Court heard closing arguments on

September 19, 2025 (ECF No. 143).  Pursuant to Federal Rule of Civil Procedure 52, this

Memorandum of Decision sets forth the Court's findings of facts and conclusions of law with

respect to liability based on the evidence and testimony presented at trial.  For the reasons set

forth below, the Court finds Mr. Neuberger personally liable under 31 U.S.C. § 3713(b).

---

[1]  The United States orally moved at trial for a partial finding under Federal Rule of Civil
Procedure 52(c) on the statute of limitations defense that Mr. Neuberger advanced in his
summary judgment motion (ECF No. 70-1 at 41–46) and motion *in limine* (ECF No. 99-1 at 15).
ECF No. 138 at 34:16–35:10.  The Court reserved decision on the motion, which has since been
rendered moot, as Mr. Neuberger advised the Court during closing argument that he is no longer
asserting a statute of limitations defense based on the timeliness of the tax assessments.  In any
event, the fully executed waivers of the statute of limitations for the tax assessments were
received in evidence.  Plaintiff's Exhibit (PX) 143–148.

Page numbers refer to the pagination of the Court's Case Management/Electronic Case
Files (CM/ECF) system printed at the top of the cited document, except that references to the
trial transcript include both the transcript page and line numbers and references to exhibits
include both the exhibit number and, as applicable, the bates number of the referenced page(s).

## I.     INTRODUCTION

Rule 52 requires that "[i]n an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a). "The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court." *Id.* "In doing so, the Court must appraise the testimony and demeanor of the witnesses, assess and evaluate the credibility of the witnesses, weigh the evidence, and choose among conflicting inferences and conclusions." *Brooks* v. *United States*, Civil Action No. TJS-21-1029, 2023 WL 6599008, at *1 (D. Md. Oct. 10, 2023). Rule 52(a) does not, however, "require the court to make findings on all facts presented or to make detailed evidentiary findings; if the findings are sufficient to support the ultimate conclusion of the court they are sufficient." *Darter* v. *Greenville Cmty. Hotel Corp.*, 301 F.2d 70, 75 (4th Cir. 1962) (internal quotation marks omitted). Thus, the Court sitting as factfinder "'need only make brief, definite, pertinent findings and conclusions upon the contested matters,' as there is no need for 'over-elaboration of detail or particularization of facts.'" *Wooten* v. *Lightburn*, 579 F. Supp. 2d 769, 772 (W.D. Va. 2008), *aff'd*, 350 Fed. Appx. 812 (4th Cir. 2009) (quoting Fed. R. Civ. P. 52(a) advisory committee's note to 1946 amendment); *accord Brooks*, 2023 WL 6599008, at *1; *AirFacts, Inc.* v. *De Amezaga*, Civil Action No. DKC-15-1489, 2022 WL 17584258, at *1 n.1 (D. Md. Dec. 12, 2022).

## II.     FINDINGS OF FACT[2]

The Court makes the following findings of fact based on the stipulated facts, relevant documentary and testimonial evidence introduced at trial, as well as any reasonable inferences and credibility assessments drawn therefrom.

---

[2] "For the sake of judicial economy, the court limits its findings of fact to facts essential to the resolution of the case." *Martz* v. *Day Dev. Co., L.C.*, 416 F. Supp. 3d 517, 520 n.2 (D. Md. 2019), *aff'd*, 35 F.4th 220 (4th Cir. 2022).

### A.    Background on Individuals and Entities

Mr. Neuberger and Hillel Tendler are attorneys and principals of the Baltimore law firm, Neuberger, Quinn, Gielen, Rubin & Gibber, P.A. (NQGRG).  ECF No. 114-1 ¶¶ 1–3.  Mr. Neuberger's practice consists of general business, family planning, and estate planning.  ECF No. 137 at 111:14.  Mr. Neuberger primarily represents high-net-worth families and family enterprises.  *Id.* at 181:6–8.  Mr. Neuberger is not a tax attorney, but he gives tax advice to clients from a planning perspective.  *Id.* at 111:21–112:1.

Michel Konig is one of NQGRG's clients.  ECF Nos. 114-1 ¶ 4; 137 at 38:24–39:2.  Mr. Neuberger is the "relationship partner" for Mr. Konig, that is, the "individual who brought the client into the firm" and who "has the primary contact with the client."  ECF No. 137 at 39:9–15; 112:20–22.  Mr. Neuberger has represented Mr. Konig and other members of the Konig family with regard to business investments and planning since approximately 1990.  *Id.* at 113:3–12.  The Konig family has investments all over the world.  *Id.* at 182:15–17.

In 2001, on behalf of Mr. Konig, NQGRG prepared and signed articles of incorporation for Lehcim Holdings, Inc. (Lehcim), which is a Maryland corporation in good standing.  ECF Nos. 114-1 ¶ 5; 137 at 103:23–104:2; 138 at 15:4–11; Joint Exhibit (JX) 001.  Mr. Konig's family has economic ownership of Lehcim.  ECF No. 136 at 23:19–22.  Mr. Neuberger and Mr. Tendler are the only two individuals who have held any position with Lehcim.  ECF No. 114-1 ¶ 8.  As Lehcim's only director, Mr. Neuberger is authorized to act on behalf of Lehcim without any meeting or approval from shareholders.  *Id.* at ¶¶ 9–10.  Lehcim's by-laws provide that the board of directors shall manage Lehcim's property and business.  JX033 at 0521.  Mr. Neuberger testified that he has authority to borrow money on behalf of Lehcim, but he "took all of [his] direction from [his] client."  ECF No. 137 at 123:1–8.  Mr. Neuberger further testified that he takes "full responsibility," but he was "not involved in the mechanics" of Lehcim's investments,

financial transactions, or tax returns. *Id.* at 192:6, 11; *see also id.* at 190:18–192:11. In his capacity as director, Mr. Neuberger appointed himself as president and treasurer and Mr. Tendler as vice president and secretary of Lehcim. ECF Nos. 114-1 ¶¶ 11, 15; 137 at 42:11–15, 118:23– 119:3; JX002. Under Lehcim's by-laws, as president, Mr. Neuberger has authority to "sign and execute all authorized bonds, contracts, or other obligations" on behalf of Lehcim. ECF No. 114-1 ¶ 12; JX033 at 0524. The by-laws further provide that Mr. Tendler, as treasurer, "shall have custody of all the funds and securities" of Lehcim and "shall disburse the funds" as ordered by the director. ECF No. 114-1 ¶¶ 13–14; JX033 at 0525. Both Mr. Neuberger and Mr. Tendler are authorized to sign documents on behalf of Lehcim. ECF No. 137 at 55:16–56:4.

Leshkowitz and Company (Leshkowitz & Co.) performs accounting, bookkeeping, and tax preparation services for entities owned by Mr. Konig, including Lehcim. ECF Nos. 114-1 ¶ 7; 136 at 21:18–22, 22:16–18, 24:12–17; 137 at 44:24–25. Joseph Leshkowitz, a certified public accountant, is a partner and founder of Leshkowitz & Co. ECF No. 136 at 19:19–20:3.

Beauville Holdings, Ltd. (Beauville), a British Virgin Islands company, is Lehcim's sole shareholder. ECF No. 114-1 ¶ 17; JX002. Since 2002, Mr. Neuberger has been Beauville's only director. ECF Nos. 114-1 ¶ 19; 137 at 124:12–13.

Nightingale Ventures, Ltd. (Nightingale) is a British Virgin Islands company. ECF No. 114-1 ¶ 20; JX003. Nightingale lends money to companies based in the United States that are owned by the Konig family so those companies can make investments. ECF Nos. 136 at 24:3– 11; 137 at 127:11–13. Mr. Neuberger was the director of Nightingale from 2002 to 2009. ECF No. 114-1 ¶ 21. During the timeframe relevant to this action, the Hassans firm in Gibraltar were agents of Nightingale. ECF No. 137 at 127:23–128:6.

Acan Associates is a partnership comprised of four entities: Lehcim; Acam West 52, Inc.; Acan AIM General, Inc.; and Wil-Coser Associates. ECF No. 137 at 129:22–130:1; Plaintiff's

Exhibit (PX) 151.  Mr. Neuberger signed the partnership agreement on behalf of all four partner
entities.  PX151 at 1950.

Ramat Associates is a partnership comprised of three entities: Lehcim; Acan West 52,
Inc.; and Wil-Coser Associates.  PX002.  Mr. Neuberger signed the partnership agreement on
behalf of all three partner entities.  PX002 at 0018.

### B.    Lehcim's Operations

Lehcim is an investment company, also known as a holding company, *i.e.*, a corporation
that holds investments.  ECF Nos. 136 at 23:7–13; 137 at 42:24–25, 185:14–18; 138 at 51:2–5.
Lehcim holds investments in other partnerships and makes investments in the United States.
ECF Nos. 136 at 23:14–16; 137 at 185:21–22.  Lehcim was originally incorporated to join a
partnership that owned One Penn Center, a commercial building in Philadelphia.  ECF Nos. 114-
1 ¶ 6; 137 at 118:8–15; JX002 ¶ 8.

Lehcim would lend to and borrow money from other entities owned by the Konig family
because they were all related companies owned by the same trusts for the benefit of the Konig
family.  ECF No. 137 at 51:16–52:1, 52:7–12.  As Mr. Tendler explained, if one entity needed
money, "in order to respect the various corporate existences of the entities, we . . . fashioned
them as loans."  *Id.* at 52:1–4.  At the end of each year when the books were reconciled,
Leshkowitz & Co. would classify some of these loans as loans and others as a repayment or
interest or something else.  *Id.* at 53:4–25.

In 2002, Mr. Neuberger executed a document that, among other things, authorized
Lehcim to borrow funds up to $2 million from Beauville and up to $5 million from Nightingale.
JX002 ¶¶ 6–7.  Lehcim borrowed $207,500 from Beauville in 2002 at the short-term applicable
federal minimum interest rate to fund its investment in One Penn Center.  ECF Nos. 114-1 ¶ 28;
137 at 50:20–21; JX004.  This was an unsecured loan.  ECF No. 137 at 50:14–15.  The

promissory note did not contain any repayment terms other than the interest rate. JX004. In 2005, Lehcim divested its interest in One Penn Center, and in 2011, the Beauville loan was converted to a capital contribution. ECF Nos. 114-1 ¶¶ 30, 33; 136 at 64:6–19.

In 2002, Lehcim borrowed $850,000 from Nightingale at an 18 percent interest rate. ECF No. 114-1 ¶ 31; JX003. This was an unsecured loan. ECF No. 137 at 48:15–17, 125:21–126:5. The promissory note did not contain any repayment terms other than the interest rate, the payment due date of April 1, 2012, and the requirement that payments be made in United States currency in Geneva, Switzerland, or another location of the payee's designation. JX003. This loan was for Lehcim to make an investment in One Penn Center. ECF No. 137 at 24:6–16. Sometime prior to December 31, 2009, Nightingale loaned Lehcim $1,349,323. PX089 ¶ 116. No interest accrued on this loan. *Id.* In 2011, Lehcim lent Nightingale $591,451.92 at the short-term federal rate, as adjusted from time to time. ECF No. 137 at 50:24–51:5; JX022. This was also an unsecured loan. ECF No. 137 at 51:6–7. The promissory note did not contain any repayment terms other than the interest rate, that it was payable upon demand, and that payment must be made in United States currency. JX022. The balance of the loans payable from Lehcim to Nightingale at the end of 2018 was $8,816,813. PX089 ¶¶ 110, 117.

In 2012, Lehcim received $18,000 from Nightingale, which it used to make charitable contribution in that same amount. ECF Nos. 114-1 ¶ 35; 137 at 56:22–58:16; JX006 at 0058. That transfer from Nightingale to Lehcim did not actually result in funds leaving the NQGRG client trust fund account, but instead the funds were merely transferred from one client-matter trust ledger to another. ECF No. 137 at 56:8–58:1.

## C.    Lehcim's Bookkeeping and Tax Returns

Lehcim "did not have a cash account" or "its own independent cash." ECF No. 136 at 143:13–16. Lehcim used NQGRG's client trust account (also known as an interest on lawyer's

trust account or IOLTA) in lieu of having a separate bank account. ECF Nos. 114-1 ¶¶ 22–23; 136 at 91:20–21; 137 at 43:14–19,121:16–18. NQGRG logged Lehcim's financial transactions in a client-matter trust ledger. ECF Nos. 114-1 ¶ 24; 137 at 44:15–20. Client-matter trust ledgers detail "information of money coming in and coming out that relates to" the client-matter account. ECF No. 136 at 28:4–5. The NQGRG client-matter trust ledger for Lehcim showed the activity within Lehcim—that is, the transfers into and out of Lehcim. ECF No. 138 at 52:2–6. At the conclusion of each tax year, Leshkowitz & Co., Lehcim's accounting firm, used NQGRG's client-matter trust ledgers to prepare the balance sheets reported on Schedule L of Lehcim's tax returns. ECF No. 114-1 ¶¶ 7, 25. Leshkowitz & Co. created trial balance sheets (which report assets, liabilities, capital, and expenses) and used those to prepare Lehcim's tax returns each year. ECF No. 136 at 33:21–34:23. Leshkowitz & Co. did not create balance sheets other than for the purposes of filing Lehcim's tax returns. *Id.* at 35:4–6.

For the tax years 2010 through 2020 Lehcim reported liabilities on the balance sheet of its Form 1120 that primarily consisted of the three Nightingale loans. ECF No. 114-1 ¶ 45; PX008–PX018. The balance sheets reported on Lehcim's tax returns constituted the final balance sheets for those years. ECF No. 136 at 37:14–17. During these same tax years, Lehcim claimed substantial tax deductions each year for the 18 percent interest accruing on the 2002 Nightingale loan. ECF No. 114-1 ¶ 46. Lehcim's 2010 through 2013 tax returns were filed late, and its 2014 and 2015 returns were timely filed. ECF No. 136 at 163:7–8, 12–21, 164:9–18.

### D.    The Internal Revenue Service's (IRS) Examination and Findings

The IRS began examining (or auditing) Lehcim's tax returns in 2014 or 2015, and over the next five years the IRS examined (or audited) Lehcim's returns for the 2010 through 2015 tax years. ECF Nos. 114-1 ¶ 41; 136 at 156:25–157:1, 157:5–6; 137 at 8:25–9:2. Lehcim was represented by counsel not affiliated with NQGRG (outside counsel) in connection with the

IRS's examination. ECF No. 114-1 ¶ 43; JX007 at 0064; JX023 at 0367. Mr. Neuberger's role was to assist outside counsel. ECF No. 138 at 9:8–10. During the examination, Mr. Neuberger and Mr. Tendler responded to document requests through Lehcim's outside counsel and were interviewed multiple times. ECF Nos. 114-1 ¶ 44; 138 at 9:14–19. By 2018, the IRS preliminarily concluded that the loan interest deductions on Lehcim's 2010-2015 returns were improper. ECF No. 114-1 ¶ 47. In June 2018, the IRS sent Lehcim a preliminary report of its findings. *Id.* at ¶ 48; JX023. Mr. Neuberger was aware of the IRS's findings by July 2018. ECF No. 114-1 ¶ 49.

On March 14, 2019, the IRS mailed a letter that described IRS's proposed changes to Lehcim's tax returns to Lehcim in care of NQGRG, and to Lehcim's outside counsel. ECF No. 114-1 ¶ 50; JX007. This letter stated, among other things, that the IRS did not believe that the Nightingale loans were bona fide and therefore the IRS would disallow the interest expenses attributable to those loans. ECF No. 114-1 ¶ 51; JX007. The IRS also proposed penalties for failure to timely file returns for the 2010-2013 tax years and a 20 percent penalty for negligent failure to accurately report income and deductions for all tax years under examination. ECF No. 114-1 ¶ 52; JX007 at 0068, 0070. Lehcim, Mr. Neuberger, and Mr. Tendler each received a copy of this letter. ECF No. 114-1 ¶¶ 53–54. Lehcim did not agree to the proposed changes, appeal the proposed changes, or pay the proposed tax. *Id.* at ¶ 55; ECF No. 137 at 17:10–17, 33:2–4, 154:7–9. Lehcim did not report the accrued interest expense on the Nightingale loan on its 2018 tax return based on Mr. Neuberger's authorization. ECF Nos. 114-1 ¶ 57; 136 at 99:6–20, 99:24–100:2.

On November 20, 2019, the IRS mailed a Statutory Notice of Deficiency that identified $1,435,245 in unpaid taxes and penalties (exclusive of interest) to Lehcim at NQGRG's office

and to Lehcim's outside counsel.[3]  ECF No. 114-1 ¶ 58; JX015.  Lehcim received the Statutory

Notice of Deficiency around the same time it was mailed.  ECF No. 114-1 ¶ 59.  The Statutory

Notice of Deficiency advised Lehcim of its right to challenge the proposed assessments in United

States Tax Court and that failure to do so would result in the assessment of the proposed

deficiencies.  *Id.* at ¶ 60; JX015 at 0205–0207.  Lehcim did not agree with the Statutory Notice

of Deficiency, but did not challenge it in the United States Tax Court.  ECF Nos. 114-1 ¶ 61; 137

at 19:3–18.  The IRS assessed Lehcim's tax deficiencies on July 13, 2020.  ECF No. 114-1 ¶ 64.

On November 30, 2020, the IRS issued to Lehcim a Final Notice of Intent to Levy in the amount

of $2,091,455.16.  *Id.* at ¶ 65.

### E.    The Repayment Plan

Mr. Neuberger, Mr. Tendler, and Mr. Leshkowitz planned to collect all of Lehcim's

receivables from various related companies, obtain a $2.6 million contribution from Beauville,

and use those funds to repay the Nightingale loans.  ECF No. 114-1 ¶ 66.  Mr. Leshkowitz

testified that "the idea would be that the [Konig] family would provide the money from the

companies that owed Lehcim money, pass the money to Lehcim, so Lehcim could pass the

money out to Nightingale."  ECF No. 136 at 90:1–3.  The plan involved only "loans receivable

and loans payable" from Konig-related companies, "not other assets."  *Id.* at 90:17–21.

This repayment plan required 10 rounds and 124 steps—that is, 124 individual booking

entries that transferred money among various entities on various loans.  ECF No. 114-1 ¶ 67; *see

also* JX009–JX014, JX016–JX020 (identifying individual steps of the plan).  The repayment plan

did not only involve Lehcim; it involved multiple companies.  ECF No. 136 at 93:8–9.  Mr.

Leshkowitz and his firm prepared the steps; Mr. Tendler monitored and facilitated the transfers;

---

[3]  Lehcim consented to extend the time to assess tax for the 2010 through 2015 tax years.
ECF No. 136 at 165:4–169:23; PX046; PX137; PX143–PX145; PX147–PX148.

and Mr. Neuberger monitored the progress of the repayment plan. ECF Nos. 114-1 ¶ 68; 137 at 62:13–63:7, 98:8–16; 138 at 11:12–25; JX010; JX026. Mr. Leshkowitz discussed the repayment plan with Mr. Neuberger, Mr. Tendler, and Mr. Konig. ECF No. 136 at 83:19–84:5. Mr. Neuberger was involved when the plan was developed conceptually. *Id.* at 93:24–94:4. He also engineered certain aspects of the plan. For example, in an email to Mr. Leshkowitz, Mr. Neuberger directed that the repayment plan exclude certain entities and include Nightingale. JX026 ("Delete Sing, Financial and Gold and include Nighting[]ale."). Mr. Konig was ultimately responsible for making the decision to implement the repayment plan (ECF No. 142 at 19–21), and, as noted, *see* II.A., *supra*, Mr. Neuberger was the relationship partner for Mr. Konig, who—as Mr. Neuberger described it—is the partner who "takes the principal responsibility in communicating with him or making certain that his work is properly attended to." ECF No. 137 at 112:25–113:2.

Mr. Leshkowitz understood the IRS's position to be that the Nightingale loans were in actuality capital contributions by the Konig family into various companies. ECF No. 136 at 88:19–22. Mr. Leshkowitz testified that any time there was a family of companies with intercompany balances he is "always desirous" of "pay[ing] off these intercompany transactions." *Id.* at 89:12–17. With respect to Lehcim, Mr. Leshkowitz testified that "where the government was taking the position that it's not a real loan, it was [his] view that the time ha[d] come" to "pay[ ] off intercompany loans." *Id.* at 89:18–22. "The primary purpose was to clean up the books and to shrink the[] intercompany loan balances. It also had the feature of showing the government that these loans were real." *Id.* at 143:2–5; *see also* ECF No. 137 at 107:15–16 (Mr. Tendler describing the repayment plan as "repayment of a loan due of money owed"), 60:16–61:7 (Mr. Tendler testifying that part of the purpose of the repayment plan was to

demonstrate to the IRS that the loans were "real loans"); 138 at 11:5–11 (Mr. Neuberger testifying to the same).

Neither Mr. Leshkowitz nor Mr. Tendler told the IRS about the repayment plan. ECF Nos. 136 at 150:13–15; 137 at 62:3–12. Mr. Neuberger testified that he was "not talking to the IRS" and that he had "no idea" if he told the IRS about the repayment plan. ECF No. 137 at 161:11–20. His testimony in this regard was unclear and unpersuasive, as was his testimony about his knowledge of the IRS's findings and communications with outside counsel regarding the IRS audit.[4] Mr. Neuberger also testified that he understood that outside counsel would present arguments to the IRS regarding the IRS's determinations. ECF No. 138 at 12:2–20.

As part of the repayment plan, "NQGRG called Lehcim's loans receivable from other Konig-related entities." ECF No. 114-1 ¶ 70. The receivables were either wired into NQGRG's IOLTA or booked as a debit from that client's ledger and as a corresponding credit to Lehcim's

---

[4] For example, Mr. Neuberger did not recall whether he received or reviewed the IRS's June 19, 2018 proposed adjustments to Lehcim's 2010 through 2015 tax returns (JX023):

> Q. Did [outside counsel], as a matter of course, share things she received from the IRS with you?
> A. I believe so.
> Q. Any reason to think she didn't share this with you?
> A. No. Honestly, I don't remember.
> Q. Okay. If you look at the bottom, is there a [NQGRG] Bates Number at the bottom?
> A. Yes.
> Q. Does that lead you to think that this is from [NQGRG]'s files?
> A. Yes.
> Q. So this is from [NQGRG]'s files, would you have reviewed this when it was received?
> A. I don't remember.

ECF No. 137 at 145:23–146:11. Mr. Neuberger's inability to recall fundamental information about the Lehcim audit is difficult to accept in light of his role as Lehcim's sole director, president, and treasurer, as well as NQGRG timekeeping records that reflect his work on tax-related issues for Lehcim and communications with outside counsel. ECF No. 137 at 146:16–20; PX001.

ledger. *Id.* at ¶ 71. Mr. Neuberger arranged for Beauville to wire approximately $2.6 million from overseas to Lehcim. *Id.* at ¶ 72; JX006 at 0062. The funds Lehcim received, including the $2.6 million from Beauville, were used to repay the Nightingale loans. ECF No. 114-1 ¶¶ 73–74; JX006 at 0062. Between June 25, 2019, and March 5, 2020, Lehcim transferred $8,816,813 to Nightingale. ECF No. 114-1 ¶ 75; JX006 at 0062. The aggregate amount of the transfers on each of the seven dates is itemized below:

| Date | Amount |
|------|--------|
| June 25, 2019 | $1,804,769 |
| September 3, 2019 | $1,774,280 |
| October 30, 2019 | $2,610,484 |
| December 3, 2019 | $123,915 |
| January 7, 2020 | $967,116 |
| January 21, 2020 | $784,052 |
| March 5, 2020 | $752,197 |
| **Total** | **$8,816,813** |

ECF No. 114-1 ¶ 75; JX006 at 0062; PX089 ¶¶ 6, 119; PX093. The June 25, 2019; September 3, 2019; October 30, 2019; and December 3, 2019 transfers were wired to a client trust account for Nightingale managed by the Hassans law firm in Gibraltar. ECF No. 114-1 ¶ 76; JX006 at 0062. By the end of 2020, Lehcim repaid the Nightingale liabilities in full. ECF No. 136 at 108:14–16.

Email correspondence between Mr. Tendler and Leshkowitz & Co. further illustrates Mr. Neuberger's central role in the development and execution of the repayment plan. On January 21, 2020, Mr. Tendler emailed Leshkowitz & Co. to inform them that the latest round of transfers was complete. ECF No. 137 at 79:22–80:6; JX018 at 0349. An employee of Leshkowitz & Co. replied that he thought outside counsel had suggested they put the repayment

12

plan on hold.  ECF No. 137 at 80:7–13; JX018 at 0349.  Mr. Tendler replied that Mr. Neuberger "took off the hold."  JX018 at 0349; *see also* ECF No. 137 at 80:14–21.

      **F.**     **IRS's Attempts at Collection**

      At the IRS's request, on December 2, 2020, Lehcim submitted a Form 433-B (Collection Information Statement for Businesses).  ECF No. 114-1 ¶ 77; JX027.  Lehcim's Form 433-B indicated, among other things, that it had no cash on hand or in banks, no investments, no available credits, and no real property.  JX027 at 0461–0463.  Lehcim identified accounts or notes receivable in the amount of $967,475, and $2,627,113 in business liabilities.  *Id.* at 0462, 0464.  In the addendum to the Form 433-B, Lehcim stated that notwithstanding the IRS's position during the examination "that the loans were not true loans," Lehcim "has continued to treat the transactions as loans on its books and in its tax returns."  *Id.* at 0466.  Mr. Neuberger signed this form on Lehcim's behalf as president.  *Id.* at 0465.

      In connection with the preparation of Lehcim's Form 433-B, Mr. Tendler emailed Leshkowitz & Co. to inquire about Lehcim's accounts payable and receivable.  ECF No. 137 at 85:5–21; JX041 at 0564 ("After all the repayments, does Lehcim owe anyone any money?  Does anyone owe Lehcim any money?"); JX042 at 0569–0570 (same).  In response, Leshkowitz & Co. provided a list of receivables and payables, which included $1,253,250 identified as "due from escrow."  JX042 at 0569.  Mr. Tendler inquired about this amount, and there was a series of email exchanges between Mr. Tendler and Leshkowitz & Co. regarding its origin, none of which definitively answer the question.  *Id.* at 0567–0568; *see also* ECF No. 137 at 86:16–87:10.  Mr. Tendler testified that he interpreted the email exchanges to mean that Leshkowitz & Co. could not find the $1,253,250 "due from escrow."  ECF No. 137 at 87:9 ("She couldn't find the cash.").  Lehcim did not include those funds on its Form 433-B.  JX027.  Mr. Tendler testified that Lehcim did, however, report those funds as an asset on its 2019 and 2020 tax returns,

13

although he did not know why.  ECF No. 137 at 101:16–23; 103:17–19.  Mr. Tendler further

testified that he "looked into" the origin of these funds and "took a little bit of a deeper dive."  *Id.*

at 102:18–19.  Mr. Tendler asserted that one of two entities related to Lehcim (Gazelle Salomon

or Gazelle Larts or both) owed Lehcim the monies that Leshkowitz & Co. identified as "due

from escrow."[5]  *Id.*  at 102:18–103:16.

---

[5]  Mr. Tendler's testimony in this regard is not a model of clarity and the undersigned finds it unpersuasive:

> Q. Then, for the sake of the court, if you could explain what the "due from escrow" represents?
>
> A. I don't know what they were intended but that was the subject of the email, which we discussed this morning, was just that.  I was asking what is this due from escrow.  I had no idea what that was referring to.
>
> I mean, you know, I've looked into it. I mean, I have definitely took a little bit of a deeper dive.  In my -- my understanding of what that was, is that starting from the time that Lehcim became a member, a partner, in L Gen, you know, not to the exclusion but along with Gazelle Salomon and Gazelle Larts, anything that was distributed, as we explained this morning, anything that was distributed to Gazelle Salomon or Gazelle Larts from January 1, '09 forward really belonged to Lehcim.
>
> I have no idea why really 253 was picked by Leshkowitz as being missing from Lehcim's assets or whatever.  And they determined that it was owed by somebody.  They termed it escrow. But really, every penny was distributed.  And even in my email I calculated it out, all the distributions, and they exceeded 4 million and something.  Some of that money Leshkowitz accounted for and some it didn't.  I don't know why.  I don't know what goes into that -- their reporting and how they book things.
>
> But it was -- all of that money was really belonging to Lehcim and, therefore, that million 253 is Lehcim's money.  If Lehcim never got it, somebody owes it to them.  Somebody owes it to Lehcim.
>
> That somebody is Gazelle Salomon and Gazelle Larts, one or the other or both, because that's who I sent the money to.

ECF No. 137 at 102:14–103:16.

In 2021, the IRS served a Notice of Levy on NQGRG for money it held on Lehcim's behalf. ECF No. 114-1 ¶ 78; JX036 at 0553. Mr. Neuberger acknowledged receipt and reported that there were no funds available. JX036 at 0553. In 2022, the IRS served a Notice of Levy on two entities Lehcim had listed on the Form 433-B as having accounts or notes receivable (Acan Associates and Wil-Coser Associates), but the IRS "received nothing." ECF Nos. 114-1 ¶ 79; 138 at 19:18–22:20; JX027 at 0462; JX036 at 0550–0551. In 2022, the IRS also served a Notice of Levy on NQGRG as alter ego of Lehcim. ECF No. 138 at 23:12–19, 24:13, 28:13–14. Thereafter, the IRS told the bank to hold the funds and not give them to the IRS until they were further directed. *Id.* at 28:15–19. The IRS did not credit Lehcim's account with the amount of the funds seized in the alter ego levy. *Id.* at 28:20–29:1, 29:8–10. The funds were not credited because the IRS received a collection appeal request from Lehcim's power of attorney, which requested that the bank hold the funds while the levy was disputed. *Id.* at 29:12–22, 30:17–22. NQGRG also filed a collection appeal. *Id.* at 32:12–14. The levied funds were (and continue to be) held in the bank because of this civil action and the related cases. *Id.* at 33:1–8.

## G.    Lehcim's Solvency

To assess Lehcim's solvency the United States retained Jessica Hollobaugh, a forensic accountant and equity shareholder of a national accounting firm, who was admitted as an expert in solvency and valuation without objection. ECF No. 138 at 36:19–37:1, 40:9–18. Ms. Hollobough evaluated Lehcim's solvency under a series of different tests. *Id.* at 44:17–45:20. As relevant here, she assessed Lehcim's solvency under the balance sheet test, which "addresses the question of whether the liabilities of an entity exceed the fair market value of its assets." PX089 ¶ 129; *see also* ECF No. 138 at 44:21–23.

A balance sheet "presents the assets of a company (what it owns) and its liabilities (what it owes) at a specific point in time." PX089 ¶ 17. The tax-basis method of accounting is a

common methodology for measuring assets and liabilities on a balance sheet.  *Id.*  This

methodology does not, however, represent the fair market value of the assets.  *Id.*  For example,

> when an entity holds an investment in another entity, such as a partnership, the initial investment is recorded at cost. The investment value is subsequently changed only to reflect the earnings of the investment (increase in investment value), net loss of the investment (decrease in investment value), additional contributions (increase in investment value), or distributions (decrease in investment value).

*Id.*  Therefore, to evaluate Lehcim's solvency under the balance sheet test, Ms. Hollobough

"started with Lehcim's tax-basis balance sheets and evaluated the fair market value of each of its

assets along with the face value of its liabilities based on the facts and circumstances known at

the time."  *Id.*  Ms. Hollobough testified that she used the information reported in Lehcim's tax

returns and NQGRG client-matter trust ledgers to create balance sheets to evaluate Lehcim's

solvency on the seven dates Lehcim transferred funds out in connection with the repayment plan.

ECF No. 138 at 48:3–12, 51:22–25, 52:2–6, 53:7–54:24; *see also* PX089 ¶¶ 9, 17; PX091–

PX100.  The seven dates of Ms. Hollobough's solvency testing were June 24, 2019; September

3, 2019; October 30, 2019; December 3, 2019; January 6, 2020; January 21, 2020; and March 5,

2020.  PX089 ¶ 9.  On all but the first and fifth dates, she assessed solvency after the incoming

funding was received and before the outgoing funding was transferred.  *Id.* at ¶¶ 9, 21.

Ms. Hollobough utilized the asset approach to arrive at the fair market value of Lehcim's

assets.  *Id.* at ¶ 15.  As part of this analysis, Ms. Hollobough adjusted some of the numbers listed

in the source documents.  *Id.* at ¶¶ 30–109.  For example, Ms. Hollobough added Lehcim's

income tax liability based on the IRS's March 14, 2019 letter.  ECF No. 138 at 57:16–58:13,

86:9–87:21; PX093.  Ms. Hollobough explained that "for solvency purposes, as of March of

2019, Lehcim was aware that there was a tax liability pending."  ECF No. 138 at 87:20–21.  She

also assessed that an amount identified as "due from escrow" ($1,253,250) had a fair market

16

value of zero dollars because it did not appear to be a collectible asset.  ECF No. 138 at 59:4–60:13; PX089 ¶¶ 37–38; PX093.  Ms. Hollobough made this determination for two reasons.  First, Ms. Hollobough testified that email exchanges between Mr. Tendler and the accountants reflected that "nobody knew what the asset actually represented or where it came from," and, second, "this particular asset was not considered as part of [the repayment] plan."  ECF No. 138 at 60:3–12, *see also id.* at 143:14–144:3.  As part of her fair market value analysis, Ms. Hollobough also increased the value of Lehcim's investment in Acan Associates by $594,219 based on the information that entity had reported on its income tax returns and Ms. Hollobough's valuation of its assets and liabilities, *id.* at 63:2–68:10, and eliminated Lehcim's deficit interest in another related entity (Ramat Associates), *id.* at 84:17–85:25, which increased the value of Lehcim by approximately $2.6 million, *id.* at 86:5–8.

In her solvency analysis, Ms. Hollobough reclassified the $8,816,813 loan due to Nightingale from a long-term liability into a current liability.  *Id.* at 88:16–24.  She did so because of the repayment plan, which scheduled repayment of the loan within a year, and also because the loan had gone into default, which "from an accounting standpoint would also trigger it to be a current liability."  *Id.* at 89:1–6.  This reclassification had no impact on Lehcim's solvency under the balance sheet test.  *Id.* at 91:14–92:11.

At trial, Nr. Neuberger questioned Ms. Hollobough about how she could include both the tax liability and the Nightingale loan on Lehcim's balance sheet.  Ms. Hollobough explained:

> I didn't make a determination like the IRS did for purposes of income taxes.  I'm doing a fair market value assessment based on solvency . . . .  I treated them the same as Lehcim treated them in their books and records . . . and how they were represented in the repayment plan.

*Id.* at 154:4–6, 10–11, 13–15.  Ms. Hollobough's analysis assessed Lehcim's solvency beginning in June 2019, several years after the IRS's audit of Lehcim's returns.  *Id.* at 91:2–4.  Ms.

Hollobough testified that regardless of whether it was a past obligation as a loan from Nightingale or a current obligation under the repayment plan, as of March 2019, Lehcim had an approximately $8.8 million obligation that had to be accounted for on Lehcim's balance sheet. *Id.* at 91:5–10, 92:24–93:4. In other words, once the amount due to Nightingale "became an obligation in the [re]payment plan," it was a financial obligation that had to be accounted for on Lehcim's balance sheet. *Id.* at 92:24–93:4.

Ultimately, Ms. Hollobough concluded that Lehcim was insolvent on each of the seven solvency testing dates before and after the transfers it made under the repayment plan. PX089 ¶¶ 120–121; PX090 ¶¶ 131–132. Below is a summary of her balance sheet test analysis.

| Solvency Testing Date | Fair Market Value of Assets | Value of Liabilities | Liabilities in Excess of Assets Before Outgoing Transfer |
|---|---|---|---|
| June 24, 2019 | $7,192,554 | $10,697,801 | ($3,505,247) |
| September 3, 2019 | $5,387,784 | $8,893,032 | ($3,505,248) |
| October 30, 2019 | $6,223,935 | $7,118,752 | ($894,817) |
| December 3, 2019 | $3,613,451 | $4,508,268 | ($894,817) |
| January 6, 2020 | $3,489,536 | $4,384,353 | ($894,817) |
| January 21, 2020 | $2,522,420 | $3,417,237 | ($894,817) |
| March 5, 2020 | $1,738,425 | $2,633,185 | ($894,760) |

PX089 ¶ 131; PX090 ¶ 131; *see also* ECF No. 138 at 94:20–114:1, 115:7–117:25; PX093–PX100.[6]

---

[6] Ms. Hollobough also concluded that Lehcim was insolvent on each of the seven solvency testing dates under the cash flow and capital adequacy tests. ECF No. 138 at 118:3–125:8; PX089 ¶¶ 135–147; PX090 ¶ 147. The cash flow test "measures whether a company is expected to be able to meet its debt obligations after considering cash flow generated by operations, as well as from any additional borrowing capacity." PX089 ¶ 18. The capital

As of December 31, 2021, there was a zero balance in NQGRG's client-matter trust ledger for Lehcim.  ECF No. 137 at 90:24–91:2; JX006 at 0063.  Mr. Tendler testified that the NQGRG client-matter trust ledgers reflect only available cash, not other property.  ECF No. 137 at 102:2–6.  Mr. Tendler also testified that although Lehcim did not "have any cash," "Mr. Konig could inject money at any time."  *Id.* at 101:7–9.  Mr. Tendler further testified that Lehcim has assets consisting of receivables from other entities and investments.  *Id*. at 104:3–13.  Mr. Tendler could not identify with any specificity, with regard to entity or amount, any receivables or investments that Lehcim had following execution of the repayment plan.  *Id.* at 106:12–24.

## III.    CONCLUSIONS OF LAW

The United States' sole cause of action arises under the Federal Priority Statute, which provides, in pertinent part, that "[a] claim of the United States Government shall be paid first when . . . a person indebted to the Government is insolvent and . . . the debtor without enough property to pay all debts makes a voluntary assignment of property . . . [or] . . . an act of bankruptcy is committed."[7]  31 U.S.C. § 3713(a)(1)(A)(i), (iii).  The term "person" in Section 3173(a) encompasses corporations.  *United States* v. *Renda*, 709 F.3d 472, 479 n.5 (5th Cir. 2013) (citing *United States* v. *Moore*, 423 U.S. 77, 78-86 (1975); *Beaston* v. *Farmers' Bank of Del.*, 37 U.S. 102, 134 (1838)).  The Federal Priority Statute "is almost as old as the Constitution, and its roots reach back even further into the English common law; the Crown exercised a

---

adequacy test "assess[es] whether a company has the ability to operate its business in the normal course."  *Id.* at ¶ 19.

[7]  Further discussion of the Federal Priority Statute is set forth in the Court's prior decisions in this case.  ECF Nos. 17, 88; *United States* v. *Neuberger*, Civil Action No. BPG-22-2977, 2023 WL 4456795, at *1 (D. Md. July 10, 2023) (*Neuberger I*); *United States* v. *Neuberger*, Civil Action No. EA-22-2977, 2024 WL 3964886, at *7-8 (D. Md. Aug. 27, 2024) (*Neuberger II*); *see also United States* v. *Tendler*, Civil Action No. JRR-24-422, 2025 WL 918132, at *1 (D. Md. Mar. 26, 2025) (a related case in which the United States asserts a Federal Priority Statute claim against Mr. Tendler).

sovereign prerogative to require that debts owed it be paid before the debts owed other creditors." *Moore*, 423 U.S. at 80. The public policy underlying the law is to secure adequate revenue. *Id.* at 81. The United States Supreme Court has therefore consistently instructed that it should be construed liberally to achieve this purpose. *Id.* at 81-82; *Beaston*, 37 U.S. at 134. As relevant here, the priority of the United States' claim requires evidence of "three elements: (1) a debt due the United States; (2) the debtor's insolvency; and (3) the occurrence of a triggering event—an assignment of property for benefit of creditors . . . or act of bankruptcy." *United States* v. *Blumenfeld*, 128 B.R. 918, 928 (E.D. Pa. 1991).

### A.    Applicability of the Federal Priority Statute

Throughout this case, Mr. Neuberger has argued that the Federal Tax Lien Act of 1966, 26 U.S.C. § 6321 *et seq.*, as opposed to the Federal Priority Statute, governs the United States' claim against him. Mr. Neuberger advanced this argument, without success, in his motions to dismiss and for summary judgment, and he raises it again in his post-trial briefing. ECF Nos. 14-1 at 4–7; 70-1 at 35–41; 142 at 7 n.2. Mr. Neuberger relies on *United States* v. *Estate of Romani*, 523 U.S. 517 (1998), a decision that he contends "requires that in cases involving tax debt, the government must obtain a lien against the taxpayer first and[ ] then[ ] it can apply the priority rules dictated in [26 U.S.C.] § 6323." ECF No. 14-1 at 6. The Honorable Beth P. Gesner, the presiding judge first assigned to this case, concluded that Mr. Neuberger's characterization of *Estate of Romani* was "far too broad." ECF No. 17; *United States* v. *Neuberger*, Civil Action No. BPG-22-2977, 2023 WL 4456795, at *2 (D. Md. July 10, 2023) (*Neuberger I*). The undersigned concurs.

*Estate of Romani* involved the interpretation and "harmoniz[ation]" of two federal statutes addressing the priority of federal tax liabilities. 523 U.S. at 530; *accord Coker* v. *Trans World Airlines, Inc.*, 165 F.3d 579, 584 (7th Cir. 1999); *United States* v. *Krasicky*, No. 15-11247,

2016 WL 1242387, at *5 (E.D. Mich. Mar. 30, 2016). "The question presented" was "whether [the Federal Priority Statute] requires that a federal tax claim be given preference over a judgment creditor's perfected lien on real property even though such a preference is not authorized by the Federal Tax Lien Act of 1966." 523 U.S. at 519. The Supreme Court held that it did not. *Id.* at 534. Instead, the Court concluded, as it had "[o]n several prior occasions," "that a specific policy embodied in a later federal statute should control [the Court's] construction of the priority statute, even though it had not been expressly amended." *Id.* at 530-531. Ultimately, the Supreme Court decided that "nothing in the text or the long history of interpreting the federal priority statute justifie[d] the conclusion that it authorizes the equivalent of a secret lien as a substitute for the expressly authorized tax lien that Congress has said 'shall not be valid' in a case of this kind." *Id.* at 534.

This reading of *Estate of Romani* is consistent with how subsequent appellate court decisions have characterized the opinion. For example, the Seventh Circuit Court of Appeals described the case as holding that "[b]ecause the judgment creditor had perfected its lien on the debtor's real property in Pennsylvania before the debtor's death and before the United States served notice of its tax liens, the Court concluded that the unrecorded federal tax liens could not claim priority over the earlier-recorded judgment under Pennsylvania law." *Straus* v. *United States*, 196 F.3d 862, 865 (7th Cir. 1999). In doing so, "[t]he Court recognized an exception to the general Federal [Priority] Statute rule, but it did so in light of a later, 'more specific statute'—namely, the Tax Lien Act of 1966—just as it had done so in prior cases involving the National Bank Act, the Transportation Act of 1920, and the Bankruptcy Act of 1898." *Id.* at 866 (quoting *Estate of Romani*, 523 U.S. at 532). The Second and Ninth Circuit Courts of Appeals have interpreted *Estate of Romani* similarly. *Nutritional Health All.* v. *Food & Drug Admin.*, 318 F.3d 92, 102 (2d Cir. 2003) ("[T]he federal government was precluded from executing the

equivalent of a 'secret lien,' by relying on the federal priority statute, 'as a substitute for the expressly authorized tax lien that Congress has said "shall not be valid" in a case of this kind.'" (quoting *Estate of Romani*, 523 U.S. at 534)); *Law Offs. of Jonathan A. Stein* v. *Cadle Co.*, 250 F.3d 716, 719 (9th Cir. 2001) (same). As the Second Circuit explained, "[s]imply put, the government could not circumvent the limitations imposed upon it by the Tax Lien Act in a case involving a federal tax claim by relying on the broadly applicable federal priority statute." *Nutritional Health All.*, 318 F.3d at 102.

The Fourth Circuit Court of Appeals has not yet had occasion to interpret or apply *Estate of Romani* but decisions of this Court—issued by distinct judicial officers—have unanimously rejected the argument that the United States' claim arises, if at all, under the Federal Tax Lien Act of 1966. *United States* v. *Tendler*, Civil Action No. JRR-24-422, 2025 WL 918132, at *13-14 (D. Md. Mar. 26, 2025); *Neuberger I*, 2023 WL 4456795, at *2-3; *see also United States* v. *Neuberger*, Civil Action No. EA-22-2977, 2024 WL 3964886, at *11 (D. Md. Aug. 27, 2024) (*Neuberger II*) (declining to revisit Judge Gesner's earlier decision on applicability of the Federal Priority Statute). As Judge Gesner explained previously, *Estate of Romani* "does not preclude application of the Priority Statute in all tax cases, but rather requires the Government 'to follow the correct procedures for securing/maintaining its statutorily[ ]authorized tax lien . . . in order to gain a priority over other *secured* creditors.'" *Neuberger I*, 2023 WL 4456795, at *2 (emphasis in original) (quoting *United States* v. *Russell*, No. 00-75597, 2002 WL 31174181, at *2 (E.D. Mich. Aug. 22, 2002)). Judge Gesner concluded that the Federal Priority Act applied because the United States had alleged that Mr. Neuberger "transferred $2,627,280 of Lehcim's funds to repay purported loans from third parties, a category of creditors not specifically delineated in the Tax Lien Act." *Id.* at *3 (internal quotation marks and citation omitted).

Similarly, the Honorable Julie R. Rubin, the presiding judge in the related Federal Priority Statute case, rejected the argument that the entity Nightingale was a "purchaser," *i.e.*, that Nightingale fell within one of the categories of creditors identified in the Tax Lien Act. *Tendler*, 2025 WL 918132, at *13-14.  "The term 'purchaser' means a person who, for adequate and full consideration . . . acquires an interest . . . in property which is valid under local law against subsequent purchasers without actual notice."  26 U.S.C. § 6323(h)(6).  Judge Rubin reasoned that "[s]ince the 1966 passage of the Tax Lien Act, multiple courts have determined that assignment for past due consideration, including transfer as repayment for moneys previously loaned by the transferee, is 'inadequate to raise the assignee to the status of purchaser within the statute.'"  *Tendler*, 2025 WL 918132, at *14 (quoting *United States* v. *Pavenick*, 197 F. Supp. 257, 259 (D.N.J. 1961)) (collecting cases).  The undersigned interprets these cases similarly and finds that the United States' claim is properly asserted under the Federal Priority Statute.

## B.    The United States' Federal Priority Statute Claim

The Court next turns to the question of whether the United States has proven each element of its claim by preponderant evidence.

### 1.    Debt Due to the United States

Under the Federal Priority Statute, "the term 'claim' or 'debt' means any amount of funds or property that has been determined by an appropriate official of the Federal Government to be owed to the United States by a person, organization, or entity other than another Federal agency."  31 U.S.C. § 3701(b)(1).  Federal courts at all levels of review have consistently held that this broad definition encompasses federal tax debt.  *E.g.*, *United States* v. *Coppola*, 85 F.3d 1015, 1020 (2d. Cir. 1996) (citing *Massachusetts* v. *United States*, 333 U.S. 611, 625-626 (1948)) ("There is no question that taxes owed to the United States fall within the scope of a

'claim of the Government' under the statute's broad terms."); *accord Price* v. *United States*, 269 U.S. 492, 499 (1926); *United States* v. *Tyler*, 528 Fed. Appx. 193, 201 (3d Cir. 2013); *Viles* v. *Commissioner*, 233 F.2d 376, 379 (6th Cir. 1956). As this Court previously held in this case, and as both parties concede, this element of the United States' claim is satisfied. ECF Nos. 88 at 17; 143; *Neuberger II*, 2024 WL 3964886, at *8.

### 2. Insolvency of Debtor

To establish the insolvency of a debtor the United States must prove that the debtor's "liabilities exceed its assets." *Neuberger I*, 2023 WL 4456795, at *4 (quoting *Bramwell* v. *United States Fid. & Guar. Co.*, 269 U.S. 483, 487 (1926)); *accord Renda*, 709 F.3d at 479 n.6; *Lakeshore Apts., Inc.* v. *United States*, 351 F.2d 349, 353 (9th Cir. 1965). Mr. Neuberger contends that insolvency must be proven by way of the balance sheet test. ECF No. 142 at 7–9. Assuming, without deciding, that the balance sheet solvency test controls, *United States* v. *Oklahoma*, 261 U.S. 253, 257 (1923), the United States has proven Lehcim's insolvency by preponderant evidence.[8]

The parties agree on much of Ms. Hollobough's balance sheet test solvency analysis with two key exceptions, which involve her treatment of (1) the Nightingale loans and (2) the cash "due from escrow."[9] Each of these contested items is addressed in turn below.

---

[8] *See also United States* v. *Press Wireless*, 187 F.2d 294, 295-296 (2d Cir. 1951); *United States* v. *Sandwich Isles Commc'ns, Inc.*, 689 F. Supp. 3d 873, 885 (D. Haw. 2023).

[9] Mr. Neuberger also appears to argue that Mr. Konig's "significant wealth" renders Lehcim solvent. ECF No. 142 at 10. This is difficult to square with his argument that the solvency analysis is governed by the balance sheet test. Whatever assets Mr. Konig and his family may have had at their disposal at the time Lehcim's repayment-plan transfers to Nightingale, they were not reflected on Lehcim's balance sheet. Indeed, Mr. Leshkowitz and Mr. Tendler testified that Lehcim did not have independent cash (ECF Nos. 136 at 143:13–16; 137 at 101:7–8), and Mr. Neuberger stipulated that as of December 31, 2021, there was a zero balance in NQGRG's client-matter trust ledger for Lehcim (ECF No. 137 at 90:24–91:2; JX006 at 0063).

i.    *Nightingale Loans and Judicial Estoppel*

Mr. Neuberger argues that the Court should "require the government, as a matter of law, to treat the Nightingale loans as equity transactions – as it has consistently maintained for more than five years and as it does to claim taxes due from Lehcim." ECF No. 142 at 14. According to Mr. Neuberger, the equitable doctrine of judicial estoppel prohibits the United States from advancing contradictory positions that the Nightingale loans were not bona fide liabilities for tax assessment purposes, but that they were liabilities for the purposes of assessing Lehcim's solvency. ECF No. 142 at 13–16. On the surface, this argument has some appeal. Upon closer scrutiny, however, it becomes clear that it is both factually and legally flawed.

First, Mr. Neuberger's framing of the issue is not quite accurate. The United States has not taken contradictory positions as to the validity of the Nightingale loans. The United States— more specifically, the IRS—audited Lehcim's tax returns and concluded that the interest deduction for the Nightingale loans should be disallowed, which ultimately resulted in a notice of tax deficiency. Lehcim opted not to contest this conclusion, and the United States has not deviated from its position regarding Lehcim's tax liabilities. As the United States correctly notes, "the IRS's disallowance of Lehcim's interest deductions is not a determination for any other purposes and it is not the right test for whether to include the debt for valuation purposes." ECF No. 141 at 12. The United States retained Ms. Hollobaugh, an expert in solvency and valuation, to evaluate Lehcim's solvency before and after each transfer of the repayment plan. Ms. Hollobaugh explained that "in March of 2019, there was a repayment plan set up. So[,] from an accounting standpoint, if you're going to pay somebody $8.8 million, whether it's a repayment of a past loan or whether it's a payment of some other expense, that $8.8 million is an obligation of some kind." ECF No. 138 at 91:5–10; *see also* I.G., *supra.* In other words, irrespective of whether the Nightingale loans were treated as debt or equity, Lehcim had an

obligation of approximately $8.8 million by virtue of its execution of the repayment plan and transfer of funds to Nightingale.  The United States has therefore not taken contradictory positions with respect to whether the Nightingale loans were bona fide.

Second, the elements of judicial estoppel are not satisfied here.  The Fourth Circuit has identified the following elements that are required to invoke the doctrine:

> (1) "the party sought to be estopped must be seeking to adopt a position that is inconsistent with a stance taken in prior litigation;" (2) "the position sought to be estopped must be one of fact rather than law or legal theory;" (3) "the prior inconsistent position must have been accepted by the court;" and (4) "the party sought to be estopped must have intentionally misled the court to gain unfair advantage."

*Minnieland Priv. Day Sch., Inc.* v. *Applied Underwriters Captive Risk Assurance Co., Inc.*, 867 F.3d 449, 458 (4th Cir. 2017) (quoting *Lowery* v. *Stovall*, 92 F.3d 219, 223-224 (4th Cir. 1996)). The Fourth Circuit has "characterized the final element as 'determinative.'"  *Id.* (quoting *Lowery*, 92 F.3d at 224).

The purpose of judicial estoppel is "to protect the integrity of the judicial process."  *New Hampshire* v. *Maine*, 532 U.S. 742, 749 (2001).  Accordingly, the doctrine is typically "invoked to prevent a party from 'playing fast and loose with the courts,' from 'blowing hot and cold as the occasion demands,' or from attempting 'to mislead the [courts] to gain unfair advantage.'" *King* v. *Herbert J. Thomas Mem'l Hosp.*, 159 F.3d 192, 196 (4th Cir. 1998) (alteration in original) (quoting *Lowery*, 92 F.3d at 223, 225); *see also Martineau* v. *Wier*, 934 F.3d 385, 393 (4th Cir. 2019) (observing that judicial estopped is typically "reserved for cases where the party to be estopped . . . create[ed] a perception that 'either the first or the second court was misled.'" (quoting *New Hampshire*, 532 U.S. at 750-751)).  Nothing of the sort is alleged in this case. Importantly, there is no allegation that the United States acted in bad faith or intentionally misled an administrative or judicial tribunal.  "Without bad faith, there can be no judicial estoppel."

*Zinkand* v. *Brown*, 478 F.3d 634, 638 (4th Cir. 2007). Further, no tribunal has accepted the prior

allegedly inconsistent position that the Nightingale loans are not bona fide because there are no

prior judicial or administrative proceedings.[10] The Fourth Circuit has explained that the

"insistence upon a court having accepted the party's prior inconsistent position ensures that

judicial estoppel is applied in the narrowest of circumstances." *Lowery*, 92 F.3d at 224.

Mr. Neuberger's assertion of judicial estoppel appears to rest on Ms. Hollobough's

treatment of Lehcim's approximately $8.8 million dollar transfer to Nightingale in Lehcim's

balance sheets. Mr. Neuberger's disagreement with Ms. Hollobough's solvency analysis falls

short of the showing required for this Court to invoke judicial estoppel, a doctrine that the Fourth

Circuit has instructed should be applied "with caution." *John S. Clark Co.* v. *Faggert and

Frieden, P.C.*, 65 F.3d 26, 29 (4th Cir. 1995).

The facts of the cases on which Mr. Neuberger relies underscore the inapplicability of the

doctrine in this case. *King* involved an age discrimination claim that the plaintiff asserted

following termination of her employment. 159 F.3d at 194. To prevail on this claim, the

plaintiff had to show that she was "able and competent to perform the services required" of her

employment at the time of her discharge. *Id.* (quoting W. Va. Code § 5–11–9(1)). The Fourth

Circuit affirmed the district court's ruling that the plaintiff was judicially estopped from asserting

that she was "able and competent" because she had previously taken the position before the

Social Security Administration that she was physically unable to perform the duties of her job

and secured an award of disability benefits based on that representation. *Id.* at 194, 197-198.

The Fourth Circuit concluded that to "allow King to obtain benefits from two sources based on

two incompatible positions, simply because the positions aid her claims for remuneration, would

---

[10] As noted, *see* II.D., *supra*, Lehcim elected not to challenge the tax liabilities before the United States Tax Court.

reduce truth to a mere financial convenience and would undermine the integrity of the judicial process."  *Id.* at 198.

Similarly, the Fourth Circuit affirmed application of judicial estoppel in *Lowery*, a case in which the plaintiff claimed that the defendant police officers had used unreasonable force against him in violation of the Fourth Amendment to the United States Constitution.  92 F.3d at 220.  There, the plaintiff was properly precluded from disputing that he had attacked one defendant based on the fact that the plaintiff had taken a contradictory position when he pled guilty to criminal charges and admitted having attacked the officer.  *Id.* at 224.  The Court of Appeals "conclude[d] that Lowery's arguments are nothing more than an intentional attempt to mislead the district court and this court to gain unfair advantage in this action."  *Id.* at 225.

Certainly, "each application" of judicial estoppel "must be decided upon its own specific facts and circumstances."  *King*, 159 F.3d at 196.  But these two cases illustrate how the facts and circumstances of this case do not warrant its invocation here.  "Courts have had difficulty in formulating a specific test for determining when judicial estoppel should be applied.  But, nonetheless, there are certain elements that have to be met before courts will apply judicial estoppel."  *Lowery*, 92 F.3d at 223-224 (internal citations omitted).  Those required elements are lacking in the case at bar.  Ms. Hollobough appropriately categorized as a liability the $8,816,813 Lehcim transferred to Nightingale.  As she explained at trial, regardless of whether the Nightingale loans were bona fide for tax assessment purposes, Lehcim assumed an $8,816,813 obligation through the repayment plan.

ii.    "*Due From Escrow*"

Mr. Neuberger also challenges Ms. Hollobough's fair market valuation of the $1,253,250 Lehcim identified in its tax returns as "due from escrow."  For multiple reasons, the undersigned concurs with Ms. Hollobough that these funds do not appear to be a collectible asset.  First, these

funds were not factored into the repayment plan, which involved 124 individual booking entries that transferred money among various entities on various loans. The repayment plan was an intricate, multistep series of financial transactions designed to "clean up the books," "shrink. . . the[] intercompany loans," and "show[ ] the government that the[] loans were real." ECF No. 136 at 143:2–5. The fact that the monies "due from escrow" did not feature within this repayment plan strongly suggests that they were not a bona fide asset. Second, the "due from escrow" funds were not listed as an asset, account receivable, or note receivable on the Form 433-B Lehcim tendered to the IRS. *See* II.F, *supra.* This suggests that Lehcim had disavowed this asset. Third, emails exchanged among Leshkowitz & Co. personnel and Mr. Tendler did not confirm the existence of these funds. As noted previously, *see id*., Mr. Tendler testified that he interpreted the email exchanges to mean that Leshkowitz & Co. could not find the $1,253,250 "due from escrow." ECF No. 137 at 87:7–9 ("Q. Did you understand her to mean that she couldn't find the 1.253 million that was due from escrow? A. Yes. She couldn't find the cash."). Finally, no cogent account of origin of these funds was offered at trial. Mr. Tendler's testimony regarding his investigation into the origin of these funds was entirely unpersuasive. *See* II.F, *supra*. The undersigned therefore concludes that these Ms. Hollobaugh properly assigned the "due from escrow" funds a fair market value of zero. The United States has proven Lehcim's insolvency before and as a result of its transfers of funds to Nightingale.

### 3.    Triggering Event

The Federal Priority Statue requires that a statutorily defined triggering event occur for the United States' claim to have priority. As applicable here, the United States must prove that Lehcim either made a voluntary assignment of property or committed an act of bankruptcy. 31 U.S.C. § 3713(a)(1)(A)(i), (iii). The United States advances multiple theories of liability, arguing that Lehcim's transfers to Nightingale were voluntary assignments, preferential transfers,

constructively fraudulent transfers, and fraudulent transfers. ECF No. 141 at 21–27. Mr.

Neuberger raises a bevy of legal arguments challenging the existence a triggering event, many of

which he raised previously in this litigation. ECF No. 142 at 22–34. The Court does not need to

address all the parties' arguments to decide whether the United States has proven this element.[11]

The United States contends that Lehcim's transfers to Nightingale under the repayment

plan were preferential transfers, which constitute acts of bankruptcy.[12] ECF No. 141 at 22–23.

---

[11] For example, it is unnecessary to determine whether Lehcim's transfers constitute voluntary assignments. Mr. Neuberger argued in his cross-motion for summary judgment, and again at trial, that "a voluntary assignment of property" within the meaning of Section 3713(a) requires "an assignment of all of the property of a debtor to someone for distribution to creditors." ECF No. 142 at 23; *see also* ECF No. 70-1 at 20–24. Although the United States asserted throughout this case that there is no such requirement (ECF Nos. 72 at 25–26; 141 at 27), during closing argument it conceded that there is some merit to Mr. Neuberger's voluntary assignment argument, which is supported by some historical precedent even if courts today apply the concept differently (ECF No. 143). *Compare Prince* v. *Bartlett*, 12 U.S. 431, 434 (1814), *with United States* v. *Coppola*, 85 F.3d 1015, 1020 (2d Cir. 1996). Because the United States asserts alternative grounds on which the repayment-plan transfers constitute triggering events, it is unnecessary for the undersigned to reconcile these (and other) conflicting cases. It is also unnecessary for the undersigned to determine whether Lehcim's transfer to Nightingale were constructively fraudulent transfers (which involves assessment of whether the original loans were bona fide) or fraudulent transfers (which involves assessment of Mr. Neuberger's intent).

[12] Mr. Neuberger argues, as he has previously, that "an act of bankruptcy requires both a 'legal act of bankruptcy' and a general divestment of all the debtor's property." ECF No. 142 at 29; *see also* ECF No. 14-1 at 9–11 (arguing that application of the Federal Priority Statute requires the existence of an insolvency proceeding). This Court previously considered and rejected this argument. ECF No. 17 at 9–10; *Neuberger I*, 2023 WL 4456795, at *4; *Tendler*, 2025 WL 918132, at *9; *see also* ECF No. 88 at 23; *Neuberger II*, 2024 WL 3964886, at *11 (declining to revisit Judge Gesner's ruling rejecting the insolvency proceeding prerequisite). The undersigned concurs in the analysis set forth in these decisions.

Mr. Neuberger also continues to press his argument, raised previously on summary judgment, that the concept of "an act of bankruptcy" is obsolete. ECF Nos. 70-1 at 25–27; 142 at 31–33. In essence, Mr. Neuberger contends that reference to an act of bankruptcy in Section 3713 has been nullified because the Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, 92 Stat. 2549 (11 U.S.C. § 101 *et seq*.), repealed earlier law on which the Supreme Court relied on in defining the phrase "act of bankruptcy" in the context of the Federal Priority Statute. For the reasons stated in the prior Memorandum Opinion denying summary judgment and in that of Judge Rubin addressing this precise issue, the undersigned declines Mr. Neuberger's invitation to reconsider its ruling on this issue (ECF No. 142 at 32). ECF No. 88 at 21–22; *Neuberger II*, 2024 WL 3964886, at *10; *Tendler*, 2025 WL 918132, at *8.

"A preferential transfer is a transfer . . . of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor while insolvent." *United States* v. *Golden Acres, Inc.*, 684 F. Supp. 96, 101 (D. Del. 1988) (alteration in original) (internal quotation marks omitted); *see also Lakeshore Apartments, Inc.* v. *United States*, 351 F.2d 349, 353 (9th Cir. 1965).

Here, there is no dispute that Lehcim transferred over $8.8 million to Nightingale. The consistent testimony of Mr. Leshkowitz, Mr. Tendler, and Mr. Neuberger was that these transfers were undertaken to repay the Nightingale loans, obligations that predated the IRS's assessment of a tax liability. As discussed previously, *see* II.G. and III.B.2., *supra*, Lehcim was insolvent at the time of each of the transfers. These transfers therefore constitute preferential transfers that satisfy the triggering event element of the United States' claim. *Neuberger II*, 2024 WL 3964886, at *11 ("Case law makes clear that a preferential transfer satisfies this element of a Federal Priority Statute claim."); *see also United States* v. *Whitney*, 654 F.2d 607, 610 (9th Cir. 1981) (concluding that payments to a state agency for unpaid payroll taxes instead of payment of federal employment taxes owed to the United States when the taxpayer was insolvent were preferential transfers); *accord Lakeshore Apartments, Inc.* v. *United States*, 351 F.2d at 353 (9th Cir. 1965); *United States* v. *Idaho Falls Assocs. Ltd. P'ship*, 81 F. Supp. 2d 1033, 1040 (D. Idaho 1999); *Golden Acres, Inc.*, 684 F. Supp. at 101; *In re Gottheiner*, 3 B.R. 404, 408 (Bankr. N.D. Cal. 1980), *aff'd*, 703 F.2d 1136 (9th Cir. 1983).

### C.    Mr. Neuberger's Representative Liability

Section 3173(b) provides that a "representative . . . paying any part of a debt of the person . . . before paying a claim of the Government is liable to the extent of the payment for unpaid claims of the Government." 31 U.S.C. § 3713(b); *see also United States* v. *Moriarty*, 8 F.3d 329, 333 (6th Cir. 1993) (holding that the United States' cause of action against a debtor's

representative is "wholly independent" from its cause of action against the debtor and accrues "once the acts which trigger the representative's liability occur"). Although the statutory language may suggest strict liability, courts have interpreted Section 3713(b) as requiring evidence that: (1) the representative transferred or distributed the debtor's assets before paying an antecedent claim of the United States; (2) when the debtor is insolvent; and (3) with knowledge or notice of the United States' claim. *United States* v. *McNicol*, 829 F.3d 77, 81-82 (1st Cir. 2016); *accord Renda*, 709 F.3d at 480-481; *Coppola*, 85 F.3d at 1020. Under the third element, the representative "must have knowledge of the debt owed . . . to the United States or notice of facts that would lead a reasonably prudent person to inquire as to the existence of the debt owed before making the challenged distribution or payment." *Coppola*, 85 F.3d at 1020.

For the reasons stated previously, *see* II.G. and III.B.2., *supra*, Lehcim was insolvent at the time of the transfers. Further, the parties concur that Mr. Neuberger had knowledge of the United States' claim. ECF Nos. 114 at 19; 114-1 ¶¶ 53–54. Thus, the only remaining questions are whether Mr. Neuberger was Lehcim's representative and whether he transferred or distributed Lehcim's assets. The answer to both is affirmative.

As set forth previously, *see* I.A., *supra*, Mr. Neuberger was Lehcim's only director, as well as its president and treasurer. Under Lehcim's by-laws, Mr. Neuberger had authority to act on behalf of Lehcim, sign contracts and documents, borrow money, and manage Lehcim's property and business. This Court previously found that the "term 'representative' in Section 3173(b) includes corporate officers, among others." *Neuberger II*, 2024 WL 3964886, at *8 n.7 (quoting *Renda*, 709 F.3d at 480 n.7); *see also Tendler*, 2025 WL 918132, at *11 ("Defendant fails to identify authority supportive of his argument that a corporate officer may be exempt from the Statute because he does not exert sufficient control.") (collecting cases finding that a corporate officer was a representative under Section 3713(b)).

The evidence also establishes that although Mr. Konig was ultimately responsible for making the decision to implement the repayment plan, Mr. Neuberger was integral to the development and execution of that plan to pay Nightingale before paying the United States.  Mr. Neuberger helped develop the plan conceptually, directed that the plan include and exclude certain entities, monitored its progress, and overruled outside counsel's decision to put the repayment plan on hold.  *See*, II.E., *supra.*  Other courts have found corporate directors and officers who took similar actions with similar fact patterns personally liable.  *E.g.*, *Lakeshore Apartments, Inc.*, 351 F.2d at 353 ("Behar and Brown were in complete control of Lakeshore's assets, they were fully aware of Lakeshore's debt to the United States, and they paid other creditors without due regard to the government's statutory priority.  They are thus liable."); *In re Gottheiner*, 3 B.R. at 408 ("Corporate officers or directors, such as Defendant Gottheiner, who have knowledge or notice of a debt owed by an insolvent corporation to the United States and who authorized payments of corporate funds constituting an act of bankruptcy, without first paying the debts owed to the United States, become personally liable to the United States to the extent of the payments.").

A contrary finding—that despite being the sole director, president, and treasurer and managing Lehcim's affairs, Mr. Neuberger is not responsible for the transfer of assets—would defy both the evidence in this case and the purpose of the representative liability provision of the Federal Priority Statute.  ECF No. 137 at 192:6–7 (Mr. Neuberger testifying that "I take full responsibility . . . I'm not shirking any responsibility"); *King* v. *United States*, 379 U.S. 329, 337 (1964) ("The purpose of [the predecessor representative liability statute] is to make those into whose hands control and possession of the debtor's assets are placed, responsible for seeing that the Government's priority is paid.").  Accordingly, the undersigned concludes that the United States has established every required element of 31 U.S.C. §§ 3173(a) and (b).

## IV.   CONCLUSION

For the foregoing reasons, the Court finds Mr. Neuberger liable as to the United States' Federal Priority Statute claim.  The parties are directed to file memoranda, not to exceed 30 pages, addressing the legal and factual bases for the calculation of damages on or before November 21, 2025.  Each party may file a response to the other party's calculation of damages, not to exceed 15 pages, on or before December 12, 2025.  The Court will contact the parties to schedule oral argument on the question of damages.  A separate Order follows.


Date:  October 23, 2025                             /s/
                                        Erin Aslan
                                        United States Magistrate Judge